Douglas Eugene HOLLADAY, Appellant,

v.

The STATE of Texas, Appellee.

No. 813–88.

Court of Criminal Appeals of Texas, En Banc.

March 6, 1991.

---

James M. Murphy, Dallas, for appellant.

John B. Holmes, Jr., Dist. Atty., and Winston E. Cochran, Jr. and Mark Vinson, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

MILLER, Judge.

Appellant was convicted upon his guilty plea of possession of a controlled substance, cocaine, weighing less than 28 grams including adulterants and dilutants. V.T.C.A. Health & Safety Code § 481.115. Pursuant to a plea bargain, the trial court assessed appellant's punishment at 7 years confinement in the Texas Department of Corrections [1], probated, and an $1,800.00 fine. Appellant raised one point of error in the court of appeals contending the trial court erred in overruling his motion to suppress the cocaine which he alleged was illegally seized. The court of appeals affirmed appellant's conviction, implicitly holding appellant was not detained for Fourth Amendment purposes. *Holladay v. State,* 755 S.W.2d 501, 505 (Tex.App.— Houston [14th Dist.] 1988). We granted appellant's petition for discretionary review to determine "[w]hether the Court of Appeals properly followed and applied this Court's decision in *Daniels v. State,* 718 S.W.2d 702 (Tex.Crim.App.1986), and the United States Supreme Court decision of *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), in affirming Petitioner's conviction".[2]

---

1. Now called the Texas Department of Criminal Justice, Institutional Division.

2. We decide this issue solely on the basis of the Fourth Amendment even though appellant raised both state and federal constitutional grounds in his motion to suppress. The court of appeals addressed appellant's point of error on the basis of *Daniels* and federal court cases, all of which were Fourth Amendment cases. No motion for rehearing was filed. In his reason for review in his petition, appellant claims

the court of appeals decided an important question of state and federal law, but appellant does not assert that the court of appeals failed to address the state constitutional issue. On the contrary, appellant argues the court of appeals failed to reach the threshold issue of *Daniels* and *U.S. v. Mendenhall,* to-wit: when was appellant detained for Fourth Amendment purposes. Thus, we only address appellant's ground for review on Fourth Amendment grounds. Tex.R. App.Proc. 202(a).

Appellant filed a motion to suppress claiming the cocaine was seized in violation of the Fourth Amendment to the United States Constitution and Art. I, § 9 of the Texas Constitution. Testifying at the hearing on the motion were appellant and Officer Burnias of the Houston Police Department's Narcotics Division, who effected appellant's arrest. A recitation of the facts developed at this hearing is necessary to the disposition of this petition. We find the court of appeals has adequately summarized the facts, and we liberally quote therefrom:

> ... On May 22, 1986, Officer Burnias and Officer Gann were on a narcotics detail at Hobby Airport in Houston when they observed appellant and Miles arrive on a flight from Miami. Both appellant and Miles appeared to be nervous. Burnias, who was in plainclothes, walked next to appellant and asked permission to speak to him, and appellant consented. As the two continued to walk, Burnias showed appellant his police identification card. He did not tell appellant that he was conducting an investigation, nor did Burnias tell appellant that he was a narcotics officer. Burnias asked appellant if he had arrived in Houston on a flight, and appellant responded that he had not. Appellant then stopped and turned to Burnias; the officer again asked appellant if he had just arrived in Houston, and he repeated that he had not. The officer asked appellant if he could see his plane ticket, and appellant responded that he had not purchased one. Burnias also asked appellant 'if he knew Mr. Miles or if he was traveling with him and he denied knowing him or even traveling with him.' Appellant was told that Miles had admitted to knowing him,[3] and appellant let out two sighs as if 'he had been had.'
>
> At this time, Burnias asked appellant for some identification; appellant, his hands trembling, handed the officer his driver's license. Burnias then asked permission to look in appellant's carry-on bag informing him that 'he had the right to refuse to look into his bag. He told us

there was nothing to hide, that I could look inside.' Two plane tickets were found in the bag; only one of the tickets apparently bore the correct name. Burnias asked appellant for permission to conduct a pat down search of him informing appellant that he did not have to allow the search. Appellant consented to the search, and then turned and put his hands against the wall. Burnias told appellant to take his hands down, told him that he was free to leave, and that he was given permission to do so. Appellant still consented to the search. A pat down search was conducted, and a bulge was detected in one of appellant's boots where a white powdery substance was found which later turned out to be cocaine. Appellant was never threatened with a search warrant, and Burnias did not display a weapon.

*Holladay,* 755 S.W.2d at 503.

In the court of appeals appellant relied on *Daniels,* 718 S.W.2d 702, a possession of a controlled substance case which is similar to this cause, to support his contention that the cocaine was illegally seized and his motion to suppress should have been granted.

The appellant in *Daniels* arrived at Houston's Intercontinental Airport from a nonstop flight from Miami, a known source city for narcotics traffic according to one of the arresting officers. The officer concluded the appellant and another man were traveling together but were trying to conceal that fact because the two men deplaned separately but then made eye contact and proceeded down the concourse without speaking. Both men looked around "nervously" and "furtively as if trying to detect surveillance." *Id.* at 704. The two police officers followed the appellant and the other man to the baggage claim area where they were laughing and joking while Daniels waited for a suitcase. The two suspects, along with the officers, then took an elevator to the parking area where the suspects were approached and questioned individually. Officer Fursten-

---

**3.** Officer Gann had been talking with Miles while Officer Burnias questioned appellant.

feld identified himself as a police officer conducting an investigation and asked to question Daniels, who consented. In response to questioning, Daniels said he was not traveling with the other man (Steve Bogden), produced a temporary driver's license bearing the name Thomas Daniels, and handed the officer a ticket folder with tickets made out to "G. Daniels" and "S. Bogden". Furstenfeld stated he was a narcotics officer, and Daniels "grew visibly more nervous at this news." *Id.* Daniels consented to a search of his luggage although Furstenfeld told him he did not have to consent and that he could require him to get a search warrant. Tablets were found and Daniels was arrested. Furstenfeld discovered cocaine on Daniels in the accompanying search of him.

There were two issues confronting this Court in *Daniels:* when did Furstenfeld have legally sufficient reason to detain Daniels, and when did he need it. The Court first noted that not all encounters between police and citizens invoke the protection of the Fourth Amendment, citing *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). 718 S.W.2d at 704. It is only when police questioning of a citizen becomes a detention that it must be supported by reasonable suspicion. *Id.* The Court found Daniels was not subject to a "detention" until Furstenfeld identified himself as a narcotics officer conducting an investigation and asked for Daniels' consent to search his suitcase. *Id.* at 706. Reasonable suspicion was therefore required to justify this stop.

There were several factors which aroused the officer's suspicion in the *Daniels* case:

(1) Daniels deplaned separately from Bogden but then made eye contact with him; Furstenfeld suspected they were traveling together but trying to conceal that fact;

(2) Daniels appeared nervous and looked behind him as he walked down the concourse;

(3) Daniels had arrived on a flight from Miami;

(4) Daniels grew visibly more nervous when Furstenfeld identified himself as a narcotics officer;

(5) Daniels' driver's license identified him as Thomas Daniels while his plane ticket was in the name G. Daniels; and

(6) Daniels denied traveling with Bogden but was carrying two plane tickets, and Furstenfeld had seen the two men together.

The Court discussed the first three factors independently of the last three because those factors dealt with Furstenfeld's initial encounter with Daniels. The Court concluded these first three factors were not reasonable grounds for any level of suspicion. *Id.* at 705. The Court went on to say, however, that the officer needed no grounds for reasonable suspicion at the point of the initial encounter with Daniels because it is permissible for a police officer to approach a citizen and ask to speak with him. *Id.* There was no detention for Fourth Amendment purposes at that time.

The Court did find, however, a detention occurred for Fourth Amendment purposes when Furstenfeld asked to search Daniels' luggage; thus, reasonable suspicion was required to justify the search, and the Court addressed the remaining three factors which arose between the initial encounter and the detention. Again, the Court found the factors did not form a basis for reasonable suspicion. *Id.* at 707. The Court said nervousness when confronted by a police officer is as indicative of guilt as innocence. *Id.*, citing *Glass v. State,* 681 S.W.2d 599, 602 (Tex.Cr.App. 1984). The discrepancy in Daniels' name was of little consequence since it was only an initial and Daniels had paid for his ticket with a credit card bearing his correct name, the imprint of which appeared on the ticket. Finally, as to the sixth factor, the Court concluded "[e]ven if Furstenfeld's conclusion that [Daniels] was lying gave rise to a reasonable suspicion 'that some activity out of the ordinary is occurring or has occurred,' it was not a reasonable ground for concluding that the unusual activity was criminal or that [Daniels] was connected to the hypothetical crime. *Meeks v. State,* 653 S.W.2d 6, 12 (Tex.Cr.App.1983)." *Dan-*

*iels,* 718 S.W.2d at 107. The Court thus held the stop of Daniels was illegal, the subsequent consent to search, whether valid or not, was fatally tainted by the illegal stop, and the evidence seized as a result of the illegal stop should have been suppressed. *Id.* at 708.[4]

In finding appellant was not detained in the case *sub judice,* the court of appeals distinguished *Daniels* on its facts. Appellant was the first to stop, a fact which is not clear in the *Daniels* opinion, and he stopped of his own volition. Also, appellant's initial responses to Officer Burnias' questions were clearly lies since the officers had seen appellant and Miles arrive together in Houston on a flight from Miami. While Daniels' initial statements to police may have been lies, it was not apparent they were erroneous on their face. Moreover, the court of appeals found it significant that Officer Burnias did not initially tell appellant he was conducting an investigation or that he was a narcotics officer, two factors which contributed to the elevation of Daniels' stop to a detention requiring reasonable suspicion. Furthermore, appellant was told several times that he was free to leave and that he did not have to consent to any searches. Contrast *Daniels,* where the appellant was not told he was free to leave and the officer implied he could get a search warrant. On the basis of all these facts and distinctions, the court of appeals concluded "any reasonable person in [appellant's] situation would have known that he was free to leave." *Holladay,* 755 S.W.2d at 505, citing *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509 (1980).[5]

In his ground for review, appellant contends the court of appeals' opinion also fails to follow the Supreme Court's opinion in *Mendenhall,* an airport search case. There, a majority of the Supreme Court could not agree as to the stop issue [6], but nevertheless five justices found no Fourth Amendment violation by the stop. Drug Enforcement Agents (DEA) approached Mendenhall in the Detroit airport after she arrived on a flight from Los Angeles. The agents, who only identified themselves as federal agents, believed Mendenhall fit the "drug courier profile", and they asked for identification and her plane ticket, which was in a name different from that of her driver's license. Mendenhall stated that she "just felt like" using a name other than her own and that she had only been in Los Angeles for two days. Upon learning the agents were narcotics agents, Mendenhall became very nervous, but she agreed to accompany them to the airport DEA office for questioning. In the office, Mendenhall

---

4. This holding in *Daniels,* that the consent was *per se* fatally tainted by the illegal stop, was implicitly overruled in *Brick v. State,* 738 S.W.2d 676, 680, n. 7 (Tex.Cr.App.1987), and expressly overruled in *Juarez v. State,* 758 S.W.2d 772, 780, n. 3 (Tex.Cr.App.1988). *Juarez* was then rejected in *Boyle v. State* (Tex.Cr.App. No. 69,743 delivered October 4, 1989) (State's Motion for Rehearing pending on other grounds), only to the extent that it says the factors which are to be considered in deciding whether a consensual search is tainted are merely guidelines.

5. The court of appeals' opinion appears to confuse the issues of "detention" and "reasonableness." The court found, 755 S.W.2d at 504, significant differences between this case and *Daniels* "which provided the basis for the officers to conduct an investigatory stop." These two differences were appellant's stopping of his own volition and his lying. The court also found other factors "which insured the reasonableness of the detention." *Id.* at 505. Those factors were that Burnias did not imply he

could obtain a search warrant if appellant refused consent to the search of his bag and that Burnias clearly testified he told appellant he was free to leave. In between discussing these four factors, the court of appeals addressed the detention issue and noted "Officer Burnias did not initially tell appellant that he was conducting an investigation or that he was a narcotics officer." *Id.* After all this discussion, the court held "that any reasonable person in [appellant's] situation would have known that he was free to leave." *Id.* Thus, the court of appeals implicitly found two things: one, appellant was *not* detained for Fourth Amendment purposes, and, two, even if he were, there were reasonable grounds to support the stop.

6. Justices Stewart and Rehnquist believed Mendenhall had not been seized within the meaning of the Fourth Amendment, while Chief Justice Burger and Justices Powell and Blackmun assumed that the stop constituted a seizure but found that it was a reasonable investigative stop not offensive to the Fourth Amendment because based on reasonable and articulable suspicion.

consented to a search of her purse which revealed another plane ticket in yet another assumed name. Mendenhall then allowed a search of her person, and heroin was found hidden in her undergarments. On these facts, the Supreme Court held there was no Fourth Amendment violation because Mendenhall voluntarily accompanied the agents to the airport DEA office and she had freely and voluntarily consented to the subsequent searches.

■ The Supreme Court has addressed the constitutionality of these airport searches numerous times since its pronouncement in *Mendenhall.* The underlying principles of law remain the same while each case turns on its specific factual circumstances. The Court reviews a "temporary detention for questioning" in the case of an airport search under the lesser standard enunciated in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *Florida v. Rodriguez,* 469 U.S. 1, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984). This temporary detention, which constitutes a seizure for Fourth Amendment purposes, is justified if based on an articulable or reasonable suspicion that a person has committed a crime or is about to commit a crime. *Rodriguez,* 105 S.Ct. at 310, citing *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality). See also *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980). This "reasonable suspicion" is something more than an inchoate and unparticularized suspicion or hunch, but it is considerably less than proof of wrongdoing by a preponderance of the evidence. *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989).

In *Sokolow, id.* 109 S.Ct. at 1587, the Court applied the *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), inquiry for probable cause determinations to the reasonable suspicion inquiry. The relevant inquiry is not whether particular conduct is innocent or guilty, but the degree of suspicion that attaches to particular types of noncriminal acts. *Sokolow,* 109 S.Ct. at 1587. Thus, we now turn to a review of the several decisions of the Supreme Court addressing the validity of airport stops and the accompanying searches.

*Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, immediately followed the *Mendenhall* decision, and the Court rendered a decision in apparent conflict with *Mendenhall.*[7] Petitioner Reid arrived in Atlanta via a flight from Fort Lauderdale, Florida, a known drug source city. A DEA agent observed Reid and another passenger several persons behind him deplane carrying similar shoulder bags. Reid occasionally looked back at the other man until they met in the terminal lobby and left together. The agent approached the men outside, identified himself as a federal narcotics agent, and asked for their ticket stubs and identification. The tickets had been purchased with Reid's credit card and indicated the men were in Florida for only one day. According to the agent, the men appeared nervous during the encounter. Reid and his cohort agreed to return to the terminal and to a search of their bags and themselves, but before the search could be executed, Reid ran and abandoned his shoulder bag. The bag was found to contain cocaine.

The Supreme Court did not consider whether Reid had been seized for Fourth Amendment purposes, but rather concluded the DEA agent could not have reasonably suspected Reid of criminal activity on the basis of his observations prior to approaching Reid and his cohort for identification.[8] The circumstances observed by the agent, that Reid arrived on a flight from Fort Lauderdale in the early morning when law enforcement activity is diminished and apparently had no luggage except the carry-on bag, "describe a very large category of presumably innocent travelers". *Reid v. Georgia,* 448 U.S. at 441, 100 S.Ct. at 2754. The Court noted the only evidence relating

---

**7.** *Reid v. Georgia* was a per curiam opinion expressing the view of Justices Brennan, Stewart, White, Marshall, and Stevens.

**8.** These factual observations were significant to the lower appellate court's decision that the DEA agent lawfully seized Reid outside the airport terminal.

to the two men's particular conduct was that Reid preceded the other man and periodically looked back at him while walking through the concourse. In regard to this evidence, the Court stated the agent's belief that the two men were trying to conceal that they were traveling together was nothing more than an inchoate and unparticularized suspicion or hunch. *Id.* The judgment of the Georgia court was vacated insofar as it rested upon the determination that the agent lawfully seized Reid when he approached him outside the airport terminal.

In *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, the Supreme Court held the respondent was illegally detained at the time of his consent to search his luggage and, in the process of so holding, distinguished an apparently conflicting *Mendenhall* decision on its facts. Two plainclothes detectives observed Royer in the Miami airport and believed that his appearance, mannerisms, luggage and actions fit the "drug courier profile." [9] Royer checked two suitcases and then proceeded down the concourse where he was stopped by the detectives and agreed to speak with them. Upon request, Royer produced his airline ticket, which bore the name "Holt", and his driver's license, which had his correct name, and explained that a friend had made his reservation. Royer became more nervous during the encounter, and the detectives informed him they were narcotics investigators and believed he was transporting narcotics. Without returning Royer's ticket or identification, the detectives asked Royer to accompany them to a room [10] and Royer complied. One of the detectives then retrieved Royer's luggage without his consent and asked for his consent to search it. Royer gave them the key to open one bag and allowed the detectives to pry open the other. Marihuana was found in both bags.

The Court stated the initial contact with Royer, asking for his ticket and driver's license, was permissible, but the encounter became a seizure for Fourth Amendment purposes when the detectives identified themselves as narcotics officers, revealed their suspicions, and asked Royer to accompany them to that room while retaining his ticket and license and giving no indication he was free to leave. *Florida v. Royer*, 103 S.Ct. at 1326. The Court agreed with the State of Florida, moreover, that reasonable suspicion existed which justified this temporary detention. At the time of the detention the detectives knew Royer was traveling under an assumed name, paid cash for a one-way ticket, checked two suitcases with only a last name and destination written on their tags, and appeared nervous. The Court concluded, however, that the detention "escalated into an investigatory procedure in a police interrogation room" at the time Royer produced for the officers the key to his suitcase. *Id.* In a footnote, the Court noted *Mendenhall* differed in important respects, to-wit:

> Here, Royer's ticket and identification remained in the possession of the officers throughout the encounter; the officers also seized and had possession of his luggage. As a practical matter, Royer could not leave the airport without them. In *Mendenhall,* no luggage was involved, the ticket and identification were immediately returned, and the officers were careful to advise that the suspect could decline to be searched. Here, the officers had seized Royer's luggage and made no effort to advise him that he need not consent to the search.

*Florida v. Royer*, 103 S.Ct. at 1327–1328, n. 9.

In two subsequent cases, the Court assumed there was a stop for Fourth Amendment purposes and considered only whether the stop was justified by a reasonable and articulable suspicion, which it so found in both cases. See *Florida v. Rodriguez,*

---

9. Royer (1) was carrying two American Tourister bags which appeared to be heavy, (2) was young, between 25–35, (3) appeared pale and nervous, looking around at other people, (4) paid for his ticket in cash with a large number of bills, (5) was dressed casually, and (6) wrote only a last name and a destination on the luggage tag rather than the usual name, address, and phone number.

10. The "room" was really a large storage closet with a small desk and two chairs.

469 U.S. 1, 105 S.Ct. 308, and *United States v. Sokolow,* 109 S.Ct. 1581. In *Florida v. Rodriguez,* respondent Rodriguez was one of three men observed by officers in the Miami airport. The Court found the following factors were grounds for "articulable suspicion": the three men had noticed the plainclothes officers and spoken furtively with each other; officers overheard one man urge the other two to "get out of here" when they were followed by officers; Rodriguez's strange movements (running in place) in attempt to evade the officers; the contradictory statements made by Rodriguez and another man when asked their names; and one officer had special training in narcotics surveillance and apprehension. *Id.,* 105 S.Ct. at 311. The facts in *Sokolow,* 109 S.Ct. 1581, supporting reasonable suspicion are even more compelling. At the time DEA agents seized Sokolow, the agents knew he had paid $2100 for two plane tickets from a roll of $20 bills; he traveled under a name not matching the name under which his telephone number was listed; his destination was Miami, a known drug source city; he stayed in Miami only 48 hours although the round trip flight from Honolulu was 20 hours; he appeared nervous; and he and his companion checked none of their four bags. The Court held, on the basis of these facts, that the agents had a reasonable suspicion to believe Sokolow was transporting illegal drugs. *Id.* at 1587. The Court did point out, however, that each factor taken alone is not proof of illegal conduct but is consistent with innocent conduct. It was the totality of the facts which amounted to reasonable suspicion. *Id.* at 1586.

■ With these decisions in mind, we now address appellant's ground for review. Officer Burnias approached appellant after he noticed appellant was nervous as he deplaned from a flight from Miami, a known source city. Burnias asked appellant if he could talk to him, and appellant consented. Burnias then showed appellant his police identification card but he did not inform him he was a narcotics investigator. At this juncture no Fourth Amendment right had been implicated by the limited contact between appellant and Burnias because "[p]olice are as free as anyone else to ask questions of their fellow citizens." *Daniels,* 718 S.W.2d at 704. See also *Florida v. Rodriguez,* 105 S.Ct. at 311. Burnias asked appellant if he had arrived in Houston on a flight, and appellant answered him "no" as he continued walking through the concourse. Appellant then stopped walking, Burnias again asked him if he had just arrived in Houston, and appellant maintained he had not, which Burnias knew was a lie. Thus, Burnias asked to see appellant's plane ticket, and appellant responded he had not purchased one. Appellant also denied traveling with or even knowing Mr. Miles who deplaned with him. In the meantime, Burnias' partner, Officer Gann, had been questioning Miles who admitted knowing and traveling with appellant. The officers confronted appellant with this information and asked for identification. Appellant produced a driver's license bearing his correct name, and Burnias observed appellant was nervous and his hands were trembling when he produced the license.

Appellant asserts in his brief that he was "detained" at the point when Burnias "demanded" that he produce identification. We do not agree with this assertion but believe this encounter falls within the range of limited, consensual stops which do not implicate the Fourth Amendment. See *Florida v. Rodriguez,* 105 S.Ct. at 308. This conclusion is not fatal to appellant's ground for review. Rather, we continue to review the facts of this case to determine if and when appellant was seized by the officers.

■ At some point Burnias apparently told appellant "he was investigating with Dade County [Florida] Narcotics".[11] Bur-

---

11. Neither party states in their briefs that Burnias admitted working with Dade County. The record from the hearing, however, contains this limited exchange between appellant and his attorney:

Q. Before Officer Burnias asked you if he could search your bag he had shown you who he was, he was a police officer?
A. Yes.

nias then asked for permission to search appellant's shoulder bag. This encounter, which was a continuum of the initial encounter, took place in the main lobby area near the ticket counters at the airport. Before searching appellant's bag, Burnias informed him he could refuse the search, but appellant said he had nothing to hide.[12] Burnias stated at the hearing that appellant was free to walk away at this point, but appellant stated he felt he was not free to leave. We find that Burnias' request for permission to search appellant's luggage converted this initial encounter into an investigative one, albeit very brief. We conclude appellant was subject to an investigative detention implicating his Fourth Amendment rights at this time. See *Daniels*, 718 S.W.2d at 706, (appellant detained when officer discovered discrepancy between name on his driver's license and plane ticket, told appellant he was narcotics officer conducting an investigation, and asked to search his suitcase); and *Florida v. Royer*, 103 S.Ct. at 1326, (Royer seized when officers identified themselves as narcotics agents, told Royer they suspected him of drug trafficking, and asked him to accompany them to a police room while they kept his ticket and identification).[13]

◼ In order for this seizure to be justified, Burnias needed reasonable suspicion to believe appellant had committed or was about to commit a crime. *Florida v. Rodriguez*, 105 S.Ct. at 310. At the time appellant was seized Officer Burnias knew the following facts:

1. Appellant deplaned, with another man, from a flight from Miami, a known drug source city;

2. Both men scanned the lounge area before walking to the monitor and appeared nervous;

3. Appellant lied about arriving in Houston on a flight from Miami;

4. Appellant lied about traveling with the other man, Mr. Miles; and

5. Appellant was nervous when he produced his driver's license for Burnias.

In addition to these particular facts, Burnias testified at the suppression hearing that he had been a police officer for almost 14 years and that he had been specifically on "airport detail" for approximately 5 years. His training for drug enforcement was predominantly on-the-job training with other officers during these years, although he was aware of the so-called "drug courier profile" and had seen a book on the subject. Burnias stated his past experience, common sense, training, and instinct aided him in suspecting certain persons of carrying drugs in the airport. See *Florida v. Rodriguez*, 469 U.S. at 6, 105 S.Ct. at 311 (officer's special training in narcotics sur-

---

Q. He had told you he was investigating with Dade County Narcotics?
A. Yes.

12. The State notes in its brief that "[i]n retrospect it is easy to see the real reason why the appellant agreed to that inspection—the narcotics were not hidden in the bag ... appellant probably believed at the time that the bag was a successful decoy, in that an officer might not persist in his investigation once the bag was found to contain no contraband." State's Brief, p. 3, fn. 4.

13. In the court of appeals' analysis of the seizure issue, it was significant that Burnias did not in fact tell appellant he was conducting an investigation or that he was a narcotics officer, see *Holladay*, 755 S.W.2d at 505, distinguishing *Daniels*. (However, see footnote 11 *supra*.) In *Daniels*, 718 S.W.2d at 706, this Court found the appellant was detained at the time the officer noted there was a discrepancy between the appellant's name and the name on his plane ticket, told the appellant he was a narcotics officer

conducting an investigation, and asked to search the appellant's suitcase. Likewise, in *Florida v. Royer*, 103 S.Ct. at 1326, the Supreme Court determined Royer was seized at the time officers identified themselves as narcotics agents, told Royer they suspected him of transporting narcotics, and asked him to accompany them to the police room. In the present cause, although Burnias did not tell appellant he was a *narcotics* officer, he nonetheless informed appellant he was a *police officer*, and Burnias was obviously conducting some investigation since he stopped appellant, a stranger, to ask him questions. In our opinion, Burnias' failure to tell appellant he was a narcotics officer investigating drug trafficking does not make this stop any less of a seizure than those in *Daniels* and *Florida v. Royer*. Nor is it determinative of the seizure issue that Burnias did not tell appellant prior to requesting permission to search his bag that he specifically was suspected of drug trafficking.

veillance was one factor considered in articulable suspicion analysis).

Any one of these factors, when considered alone, is not sufficient to support a finding of reasonable suspicion as each is consistent with innocent travel.[14] However, the relevant inquiry is not whether the particular conduct is innocent or guilty, but rather the degree of suspicion that attaches to particular noncriminal acts. *U.S. v. Sokolow*, 109 S.Ct. at 1587. Appellant's nervous conduct, his bold-face lying to Burnias, and Burnias' experience with drug trafficking surveillance led to a great degree of suspicion of appellant's behavior that something criminal was afoot, specifically drug trafficking. We therefore hold that when the factors are considered in toto their probative force is sufficient to authorize a reasonable suspicion of wrongdoing by appellant. *Crockett v. State*, 803 S.W.2d 308, 312 (Tex.Cr.App.1991). Also see *U.S. v. Sokolow*, 109 S.Ct. at 1586, citing *Florida v. Royer*, 460 U.S. 491, 502, 103 S.Ct. 1319, 1326. We find no constitutional violation in the stop and subsequent search of appellant.

This Court's recent opinion in *Crockett* addressed the legal requirement of reasonable suspicion. In *Crockett*, Houston police officers, based merely on their observations of the appellant in an Amtrak station, suspected him of transporting illegal drugs. They conducted a warrantless search of the appellant's luggage and found a large quantity of marihuana. After reviewing the facts developed on the motion to suppress, this Court found the appellant's suspicious conduct was not "sufficiently distinguishable from that of innocent people" to support a reasonable suspicion of criminal wrongdoing.[15] Op. at p. 311. At the time of the stop and search of Crockett, the law enforcement officers knew the appellant was traveling to Chicago, used cash to purchase his ticket, looked around the train station lobby, spoke little with his traveling companions, and became nervous when asked for identification.[16] The record in that cause, however, was devoid of any evidence that persons traveling to Chicago were more likely to be transporting illegal drugs than persons traveling elsewhere, that drug dealers make cash purchases more frequently than other persons, that they talk less with their friends, view their surroundings more, or become uncommonly nervous when stopped by police. Apparently there was also no testimony indicating the officers' suspicions in this case were based on any personal experience with drug couriers. See discussion at Op. p. 312. Based on these facts, or lack thereof, the Court concluded "a well-founded, reasonable suspicion of criminal wrongdoing simply was not objectively justified in this case." Op. at p. 313.

The facts developed at the suppression hearing in the case *sub judice*, as set out *supra*, clearly distinguish it from *Crockett*, as well as *Daniels*. Accordingly, appellant's ground for review is overruled, and the judgment of the court of appeals is affirmed.

BAIRD, J., concurs in the result.

---

14. The first fact is descriptive of every passenger deplaning from that flight and, thus, describes "a very large category of presumably innocent travelers". *Reid v. Georgia*, 448 U.S. at 441, 100 S.Ct. at 2754. We likewise find that true of the second fact known to Burnias, as many travelers scan the area looking for family or friends who are meeting them at the airport, to get their bearings in an unfamiliar area, or to find the location of the next gate for their connecting flight. At the hearing, Burnias could not articulate specific aspects of appellant's behavior (other than scanning the area) which indicated nervousness, but stated appellant's behavior was "not common with a passenger that is coming off an airplane", and he based this opinion on his experience of "look[ing] at passengers every day." In *Daniels*, 718 S.W.2d at

707, the Court noted that lying, while giving rise to a reasonable suspicion that some activity out of the ordinary was occurring, it was not a reasonable ground for concluding that the unusual activity was criminal. The Court also said that nervousness when confronted by a police officer is as indicative of innocence as guilt. *Id.*

15. The question of when the appellant was "seized" was not before the Court. Op. at p. 310, n. 6.

16. The Court declined to hold as a matter of law that these factors were "altogether irrelevant upon the question of drug transportation." Op. at p. 312, n. 11.

CLINTON and OVERSTREET, JJ., dissent.

MALONEY, J., not participating.

1983). With this understanding, we refuse appellant's petition for discretionary review.