**The STATE of Texas, Appellant,**

v.

**Winston A. GRANT and Neville Antonio Kelly, Appellees.**

Nos. C14–91–00321–CR,
A14–91–00322–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

May 21, 1992.

Rehearing Denied June 18, 1992.

Discretionary Review Refused
Sept. 23, 1992.

Alan Curry, Houston, for appellant.

David L. Singer, Houston, for appellees.

Before ROBERTSON, SEARS and DRAUGHN, JJ.

## OPINION

DRAUGHN, Justice.

Co-appellees, Winston A. Grant and Neville Antonio Kelly, were charged with the felony possession of marihuana. The trial court granted appellee's motion to suppress the marihuana evidence found in luggage

located near the appellees inside a Houston bus station. The State appeals, alleging the trial court erred in suppressing the evidence because the appellees had abandoned the luggage, and their subsequent arrest following the positive reaction by the narcotics dog to the luggage, was constitutionally proper. We reverse and remand.

The record reflects that Houston Police Department officers received information that Jamaicans were now transferring narcotics to San Antonio from a downtown Houston bus station to avoid using Houston airports. Prior to this instance, Houston police had conducted numerous narcotic investigations at this bus station. In fact, several police officers and a narcotics detection dog were assigned to the station, and a number of arrests had occurred.

During the early morning hours of May 12, 1991, narcotics officer L.A. Hundersmarck was outside the bus station when he noticed appellee, Winston A. Grant, and co-appellee, Neville Antonio Kelly, exiting from a private car. After paying cash to the driver, they carried five suitcases between them into the bus station, where they stopped temporarily at the snack bar and then proceeded, with the five bags, to the far end of the bus station near a deserted gate. Another officer, P.E. Corley, a canine handler, also had observed the men as they entered the station, and both officers testified that Grant and Kelly appeared nervous and continuously looked around. Once they reached the deserted gate area of the bus station, they set their luggage down and separated themselves from it by walking to a nearby wall some five to ten feet away, which they stood behind. According to the officers, the two men looked or peeked around the corner of the wall toward the front of the bus station from time to time.

After observing them for awhile, the two officers approached them, and Officer Hundersmarck asked Grant if he could talk with him and identified himself as a police officer. Grant consented and, in response to the officer's question, said he was enroute to San Antonio. Hundersmarck then asked him if the nearby luggage which he had carried across the terminal belonged to him. He answered that it did not and denied any knowledge as to who the owner might be. There is no indication that he offered any explanation as to the luggage located five to ten feet away.

During this same time, Officer Corley identified himself as a police officer to co-appellee, Kelly, and inquired if he could talk with him. Kelly agreed and responded to the officer that he, too, was traveling to San Antonio. When Corley asked him if the suitcases he had brought into the station were his, he also answered no and denied knowing who owned the luggage. Officer Corley then left and returned with a narcotics detection dog, named Castro, which was assigned to him. After sniffing the suitcases, Castro reacted with a "positive alert" to three of them. The officers then detained Grant and Kelly, searched the bags, found a quantity of marihuana, and charged the appellees with felony possession of marihuana.

After a pre-trial hearing, the trial court granted appellees' motions to suppress the marihuana as evidence because they had been illegally detained in violation of their rights under the Fourth Amendment to the U.S. Constitution and article I, section 9 of the Texas Constitution. In reaching his decision, the trial court surprisingly concluded that abandonment of the luggage was not an issue. Thus, he necessarily found that the officers, by merely asking appellees if the suitcases belonged to them, had illegally detained them in violation of their state and federal constitutional rights.

■ The State, in challenging the trial court's finding under the Fourth Amendment, asserts that when the officers approached the appellees and asked if they could talk with them, and they agreed, this was a limited consensual encounter that implicated no Fourth Amendment interests. *Florida v. Rodriquez,* 469 U.S. 1, 5–6, 105 S.Ct. 308, 310, 83 L.Ed.2d 165 (1984). We agree.

■ Not every encounter between a citizen and a police officer amounts to a

seizure requiring constitutional justification. *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983). A person is seized in the context of the Fourth Amendment if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). Limited police questioning, by itself, is unlikely to result in a Fourth Amendment violation. *I.N.S. v. Delgado,* 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984); *Norman v. State,* 795 S.W.2d 249, 250 (Tex.App.—Houston [14th Dist.] 1990, pet. ref'd). An investigative stop requiring articulable suspicion occurs only when a police officer accosts an individual and restrains his freedom to walk away. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968). An initially consensual encounter between an officer and a citizen can change into a seizure or detention within the meaning of the Fourth Amendment. *In Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), two policeman physically detained a citizen after he refused the officers' request to identify himself. The Supreme Court held that absent some reasonable suspicion of misconduct, the detention violated his Fourth Amendment right to be free from unreasonable seizure. *Id.,* at 52, 99 S.Ct. at 2641. But police questioning alone is not per se violative of the Fourth Amendment protection. As the Supreme Court stated in *I.N.S. v. Delgado:*

> "What is apparent from *Royer* and *Brown* is that police questioning, by itself, is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response. Cf. *Schneckloth v. Bustamonte,* 412 U.S. 218, 231–234, 93 S.Ct. 2041, 2049–2051, 36 L.Ed.2d 854 (1973). Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say

that the questioning resulted in a detention under the Fourth Amendment. But if the person refuses to answer and the police take additional steps—such as those taken in Brown—to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure." Citing *U.S. v. Mendenhall,* 446 U.S., at 554, 100 S.Ct., at 1877, and *Terry v. Ohio,* 392 U.S., at 21, 88 S.Ct. at 1880.

In two recent cases, the Court of Criminal Appeals has also laid down some guidelines concerning permissible and impermissible contact between officers and suspects. *Holladay v. State,* 805 S.W.2d 464 (Tex. Crim.App.1991); *Crockett v. State,* 803 S.W.2d 308 (Tex.Crim.App.1991). In *Holladay,* an officer asked a suspect if he could talk to him after the suspect seemed nervous in deplaning from a Miami flight. The suspect consented and the officer displayed his police identification card. He asked the individual if he had just arrived in Houston and asked to see his plane ticket. The officer also inquired if the suspect knew or had traveled with another known suspect. He then asked the suspect for some identification. The court found these limited inquiries did not convert the initial encounter into a seizure violative of the Fourth Amendment. The court concluded that police officers are allowed just as much freedom as anyone else to question fellow citizens. *Holladay* at 471, (citing *Daniels v. State,* 718 S.W.2d 702, 702, 704).

In *Crockett v. State,* the Court of Criminal Appeals found that a temporary detention was not justified where the officer relied on conduct that was equally consistent with innocent activity. Crockett's female companion had purchased with cash, two train tickets to Chicago at the Amtrak station. An officer approached Crockett, identified himself as a police officer, and asked to speak with Crockett, who agreed. In response to the officer's question, Crockett said he was going to Fayetteville, North Carolina, and he was worried about missing the train. The officer then advised Crockett that he was investigating narcotics traffic and asked if he might be carry-

ing illegal drugs in his luggage. Crockett responded that he was not. The officer then asked if Crockett would mind his searching the bags. Crockett demanded to know whether the officer had a search warrant. The officer said he did not, but that he had the right to detain Crockett long enough for a dog to smell his bags. Crockett agreed to move his luggage to another area. A narcotics dog was produced, sniffed the luggage, reacted positively, and marihuana was found. Crockett was formally arrested. The Court of Criminal Appeals held that Crockett's travel to Chicago, his use of cash to purchase tickets, his looking nervous when detained by the officer, and his speaking little with his traveling companion, did not justify a reasonable suspicion of criminal activity to support a temporary detention for investigative purposes.

■■■ *Crockett* is distinguishable from this case. In *Crockett,* ownership of the luggage was not denied and the officer proceeded to question him about drugs. And in response to the search warrant inquiry, the officer told Crockett that he had the right to detain him so the narcotics dog could smell his bags. Here, the appellees voluntarily responded to the officers' questions and denied any ownership or interest in the luggage located several feet away. The questions asked of appellees were less intrusive than those in *Crockett* and even those in *Holladay.* In view of the information the officers had and what they observed, their questions were reasonable and minimally intrusive. They identified themselves as officers, asked where the appellants were going, and if the luggage belonged to them. Once appellees denied any interest in the luggage, the officers were entitled to have the narcotics dog check it out. Unlike *Crockett,* it was only after the dog positively responded that the appellees were detained and not free to leave. Appellees' actions prior to this detention were the equivalent of a voluntary abandonment. They simply denied any ownership or having any knowledge about who might own the bags. Nor did they claim any quasi-agency relationship to the bags as was the case in *Willis v. State,* 801

S.W.2d 204 (Tex.App.—Houston [14th Dist.] 1990). Willis told officers that he was retrieving the bag for a lady who had paid him fifty dollars. Here, appellees simply denied any ownership or any knowledge about who might own the bags. In *Willis,* the officer asked him if they could search the bag, and when Willis refused to consent, directed him to another room in the airport. We expressed doubt in *Willis* that he felt free to leave at that point. *Willis* at 208. In the case before us, it would have been superfluous for the officers to ask the appellees for consent to search the bags. They said they not only did not own the bags, they did not know who did. In our opinion, short of a carefully constructed legal statement of abandonment, the intent to abandon could not be more clearly expressed. Under such circumstances, the appellees had no reasonable expectation of privacy in the bags. *Rogas v. State,* 725 S.W.2d 434, 438 (Tex.App.—Houston [14th Dist.] 1987, pet. ref'd); *Hurtado v. State,* 722 S.W.2d 184 (Tex.App.—Houston [14th Dist.] 1986, pet. ref'd); *Garcia v. State,* 704 S.W.2d 512, 516 (Tex.App.—Houston [14th Dist.] 1986, pet. ref'd). Absent a reasonable privacy expectation by appellees, there is no constitutional impediment to the officers subjecting the "unowned" bags to a canine sniff. When police take possession of abandoned property, there is no seizure under the Fourth Amendment. *Clapp v. State,* 639 S.W.2d 949, 953 (Tex.Crim.App.1982); *Sullivan v. State,* 564 S.W.2d 698, 702–704 (Tex.Crim.App.1977); *Garcia,* 704 S.W.2d at 516.

We find that the questions asked of the appellees and their voluntary answers amounted to a consensual encounter in a public place and did not constitute an investigatory detainment so intrusive on their liberty as to implicate the Fourth Amendment.

Appellees refer us to *Heitman v. State,* 815 S.W.2d 681 (Tex.Crim.App.1991), and contend that the questioning of the appellees under these circumstances constituted a violation of article I, section 9 of the Texas Constitution. The Court of Criminal Appeals by virtue of *Heitman* now re-

quires us to do an analysis on independent state grounds to determine whether the Texas Constitution is violated by the police questions here. However, it does not give us any guidelines by which to make such an analysis. Nor have the appellees provided us with a state precedential analysis supporting their position, other than cases decided on Fourth Amendment grounds. Nor could they. Until *Heitman,* no specific state constitutional analysis was required, and, therefore, none existed. What precedents we had, prior to *Heitman,* interpret article I, section 9 of the Texas Constitution and the Fourth Amendment to the United States Constitution to be the same. *See Heitman* at 682–683 (and the cases cited therein). However, appellees in their brief did set out their Texas Constitutional claim separately and refer to it repeatedly, thus requiring us, under *Heitman,* to determine the issue independently. Appellees also sought to substantiate this constitutional claim under the rationale of *Holladay, Crockett,* and *Willis,* which we have distinguished.

We find the abandonment issue determinative of this case under the Texas case law previously discussed. We also conclude, if Heitman requires us to do so, that there are no state analytical precedents other than those concerning the Fourth Amendment which deal with this particular subject matter. Indeed, prior to *Heitman,* from 1876 to 1991, we find no case precedent in this state which holds that article I, section 9 is to be interpreted to impose greater restrictions upon law enforcement officers than the Fourth Amendment. In fact, there are many cases cited in *Heitman* which hold to the contrary. To which we would add *Gearing v. State,* 685 S.W.2d 326 (Tex.Crim.App.1985). In *Gearing,* the Court of Criminal Appeals cited and quoted with approval language from *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229. The approved quotation from *Royer* is as follows:

> "Second, law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. (citations omitted). Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. (citations omitted). The person approached, however, need not answer any question put to him; indeed he may decline to listen to the questions at all and may go his way." (citation omitted)

> Asking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves ... *Royer,* 103 S.Ct. at 1326.

The *Gearing* opinion then concluded as follows:

> We do not interpret Article I, Section 9, Texas Constitution to require more than the Fourth Amendment in the above described situation. *Gearing,* 685 S.W.2d at 328–329.

As *Heitman* permits, we utilize the logic and reasoning of these prior federal and state precedents as permissive authority, along with the more recent state precedents previously discussed. We find the analysis in these precedents sound. It comports with our analysis. And we find no viable reason in case law, logic, or common sense as to why we should reach a different result under article I, section 9 of the Texas Constitution than that reached under our Fourth Amendment analysis. We find no constitutionally impermissible seizure of appellees by the officers when they identified themselves, asked appellee where they were going, and if they owned the bags located five to ten feet away. Rather, we find that this was a limited consensual contact between the officers and the appellees which is permissible under article I, section 9 of the Texas Constitution. *Florida v. Rodriguez, I.N.S. v. Delgado, Holladay v. State, Crockett v. State, Willis v. State.* In view of the long line of precedents since the adoption of article I, section 9 of our State Constitution in 1876, it is hard to conceive that our

constitution should now prohibit law enforcement officers from asking the questions asked of appellees in the circumstances of this case. The intrusions are minor and measurably further public interests in enforcement of our state laws aimed at curbing drug trafficking.

Accordingly, we reverse the trial court's order granting appellee's motion to suppress and remand the case to the trial court.