COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                       NOS.  2-03-421-CR

        2-03-422-CR

 

 

JEFFREY MICHAEL ST. GEORGE, JR.                                      APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

             FROM
THE COUNTY COURT AT LAW OF HOOD COUNTY

 

                                              ------------

 

 

                                OPINION
ON REHEARING

 

 

                                               -----------

We granted the State=s motion for rehearing en banc. The case was reargued on November 18,
2004.  On December 16, 2005, we withdrew
our opinion and judgment of August 31, 2004. 
We substitute the following.








Appellant Jeffrey Michael St.
George, Jr. was charged with the offenses of possession of marijuana and
failure to identify as a fugitive. 
Appellant filed two motions to suppress, which were denied following a
hearing.  Appellant subsequently pleaded
guilty to both charges and received deferred adjudication community
supervision.  The trial court granted
Appellant permission to appeal its rulings denying his motions.  In two issues, Appellant contends that the
trial court erred by denying his motions to suppress because his interrogation
and prolonged detention as a passenger of a vehicle subject to a routine
traffic stop violated the Fourth Amendment to the United States
Constitution.  See U.S. Const. amend. IV. 

On the evening of October 21,
2002, Hood County Sheriff=s Deputies
Sonny Frisbee and Robert Young stopped a vehicle traveling on State Highway 377
toward Fort Worth.  The basis for the
stop was an inoperative license plate light. 
Appellant was a passenger in the vehicle, which was driven by his
mother.  The stop was videotaped by the
camera inside the patrol vehicle and audiotaped by a microphone worn by Deputy
Young.  








At the suppression hearing,
Deputy Young testified that Deputy Frisbee made contact with the driver when
they made the stop and then asked Appellant if he had any identification with
him.  He thought Appellant gave Deputy
Frisbee the name of John Christopher St. George and a date of birth of
12/16/75.  The name came back Ano record,@ Deputy
Young said.  When they went back to the
car to verify that they had the correct information, the name Astarted to change.@   Ultimately, the officers
learned that Appellant=s true name
was Jeffrey Michael St. George and that he had six outstanding warrants.  Deputy Frisbee arrested him and found
marijuana in a cigarette package in his pocket in the course of a pat-down
search.  

As to what basis the officers
had to detain Appellant, Deputy Young testified that Appellant Awasn=t detained.@  Deputy Young stated, AHe was a passenger . . . .  He
hadn=t committed an offense . . . . 
Absolutely [he was free to go.]@  As to why he questioned
Appellant, Deputy Young responded that he did not consider the contact as
investigatory; the purpose was Ajust to talk.@  However, he did have other reasons, he said:
Appellant was slouched down and did not make eye contact, A[s]o he appeared nervous.@   

Deputy Frisbee authenticated
the videotape of the stop as an accurate depiction of the stop.  The events that transpired as shown on the
videotape are summarized as follows.  The
times are the minutes and seconds elapsed after the first image appears on the
videotape.

1:35          Officers activate their lights behind
a vehicle and both vehicles come to a complete stop.  One officer says:  AIs that a guy?  . . . 
Let=s see
what=s up.@

 

1:58          Deputy Frisbee walks to driver=s
side of stopped vehicle and informs 
Appellant=s
mother that she has been stopped because her license plate light is out.  Without pausing, he asks Appellant through
the driver=s
window whether he has any identification with him. Appellant responds, ANo.@              

 








2:25          Deputy Young has approached Appellant=s
side of the vehicle and engages in an inaudible conversation with
Appellant.  

 

3:07          Deputy Frisbee also walks to Appellant=s
side of the vehicle and speaks with Appellant; the audio cuts out.  The mother exits the vehicle, and Deputy
Young shows her that her license plate light is out and tells her she will be
given a warning ticket and it Awill just take a second.@

  

3:52          Deputies Young and Frisbee meet at the
front of the patrol vehicle.  Deputy
Frisbee tells Deputy Young that Appellant has identified himself as AJohn
St. George@ and
is Anervous.@  

 

4:03          Deputy Frisbee returns to the patrol
vehicle; Deputy Young returns to Appellant=s side of the vehicle and
addresses the mother through Appellant=s side window, telling her it
will Ajust
be a few minutes@ and
that they are just going to write a warning ticket.  Deputy Young then also returns to the patrol
vehicle.

 

4:40          Only background noises for a minute and
then the audio cuts out for another minute.

 

6:25          The dispatcher is heard over the patrol
vehicle=s
radio informing the deputies that the mother has a valid license and that is it
is Aclear.@ The
dispatcher also informs the deputies that she could locate neither a license
nor warrants for a John St. George with a date of birth of 12/16/75.  

 

9:00          Deputy
Young can be seen standing by the patrol vehicle, apparently waiting on Deputy
Frisbee to finish writing the ticket.  

 

9:37          Deputy Young approaches Appellant and
asks Appellant if he has Aever@ had
a driver=s
license.  Appellant replies that he
has.  Deputy Young asks him if it is
expired.  Appellant answers, AYeah.  I don=t drive around.@

 

9:43         At
the same time, Deputy Frisbee approaches the driver.  He hands her the warning ticket and appears
to be explaining it to her.

 








10:03        Deputy Young informs Appellant that they
could not find a driver=s
license when they checked and asks if his license is expired. Deputy Young asks
Appellant for his middle name and Appellant replies that it is AMichael.@
Deputy Young asks the dispatcher to check for a John Michael St. George. 

 

10:18        Deputy Young asks Appellant for his date
of birth again.  Appellant responds: AIs
there a problem?@  Deputy Young replies, AYou
said you had a license, but didn=t have it with you, but they
didn=t
find it.@ 

 

10:42        The dispatcher interrupts that she has
found a AJohn
Christopher St. George@ with
a date of birth of 12/16/82.  Deputy
Young asks Appellant AIt=s not
Christopher, is it?@
Appellant replies, AThat=s
what I said.@  Deputy Young responds, AYou
said Michael.@  Appellant replies, ANo.@

 

10:58        Deputy Young is still standing by the
passenger door as he asks the dispatcher to go ahead and check the name that
she has found.

 

11:04        Deputy Frisbee walks to the passenger=s
side of the vehicle, where he remains standing next to Appellant=s
door while Deputy Young walks to the driver=s side and asks the driver if
the passenger is her son, and she says Ayes.@  Deputy Young asks the mother twice whether
his middle name is Michael or Christopher, and she replies twice that his
middle name is Michael.  

 

11:36        Deputy Young returns to the passenger=s
side where Deputy Frisbee is still standing and asks Appellant, ASo
Christopher is your middle name?@ Appellant replies, AYes.@
Deputy Young then informs the driver that Appellant has just stated that his
middle name is Christopher.  His mother
responds clearly that his name is AJeffrey Michael.@ 

 








11:51        Deputy Young asks Appellant, AWhat=s
wrong?@  Appellant responds, AThe
problem is you=re
questioning someone who is not even driving a car and just sitting here and she
got her ticket and there shouldn=t be any other problem here.@  Deputy Young responds, AIt=s
just because you=re
nervous.@  Deputies Young and Frisbee continue to stand
in front of Appellant=s
door and engage in further conversation with both occupants.  Audio cuts out for 5 seconds.

 

12:19        The audio resumes with both occupants
again telling the deputies that Appellant=s middle name is Michael. 

 

12:28        Deputy Young finally tells the
dispatcher that the middle name of the passenger is going to be Michael.  Deputy Young tells Appellant that they are
just making sure he is who he says he is and asks him if he has any form of
picture identification, to which Appellant responds, ANo.@  

 

13:13        Both deputies continue to stand in front
of the passenger side  door.  Deputy Young leans down to speak with
Appellant; the audio cuts out.   

 

14:13        Once the audio returns, Deputy Young
states to Appellant, AJust
be sure you give us the right name . . . . As soon as we get a return on that
we=ll be
all done.@  

 

14:24        The dispatcher informs the deputies that
she is unable to locate a driver=s license for AJohn
Michael St. George@ with
a date of birth of 12/16/75.  Deputy
Young asks Appellant again if the date of birth he has given is correct, and
then asks, AWhat=s the
real date of birth?@  Appellant states that it is 12/6/77.

 

14:42        Deputy Young requests that dispatch run AJohn
Michael St. George@ with
the date of birth of 12/6/77.  

 

15:05        Deputy Young again leans down to speak
with Appellant  and asks if he has Atickets
out or anything@; the
audio again cuts out.

 








15:37        The audio resumes as Deputy Young stands
up and notifies the dispatcher to run a Anew@
name, AJeffrey
Michael St. George@ with
date of birth 12/6/77.  Deputy Young
informs Appellant, AAs
long as we get a return on his license and everything=s
fine, you=re
not going to get in trouble for all the different names, even though you
can.  It=s
failure to identify.@  Deputy Young states, AWe
just want to find out your right name. 
It=s all
we are interested in.@

 

19:06        The dispatcher informs the deputies that
she has found a Jeffrey Michael St. George with outstanding warrants for
speeding and no insurance.  Appellant is
told to exit the vehicle and is arrested and handcuffed for the warrants.  During a pat-down search, marijuana is found
in a pack of cigarettes in Appellant=s pocket.  

 

Appellant challenges the
denial of his motions to suppress evidence of the false identifications in
response to the requests for his identity and the contraband obtained
as the result of the search incident to his arrest.

We review the trial court=s rulings on a motion to suppress under a bifurcated standard of
review.[1]  In reviewing the trial court=s decision, we do not engage in our own factual review.[2]
 The trial judge is the sole trier of
fact and judge of the credibility of the witnesses and the weight to be given
their testimony.[3]  Therefore, we give almost total deference to
a trial court=s
determination of historical facts.[4]  








In this case, the trial court
did not make explicit findings of historical fact.  We therefore review the evidence in the light
most favorable to the trial court=s ruling and assume that the trial court made implicit findings of fact
supported by the record.[5]  However, we review de novo the determination
of whether a specific search or seizure was Areasonable@ as an
ultimate question of Fourth Amendment law.[6]








The Fourth Amendment forbids
unreasonable searches and seizures.[7]  AThe right of the people to be secure in their persons@ guarantees individuals  a
reasonable expectation of privacy, whether in their homes or on the street.[8]  The temporary detention of individuals during
a traffic stop has been characterized as a Aseizure@ of persons
within the meaning of the Fourth Amendment.[9]  Routine traffic stops are analogous to
investigative detentions and are governed by Terry v. Ohio.[10]  Thus, our framework for determining the
reasonableness of an investigative detention based on a traffic stop is
provided by Terry, under which police officers may stop and briefly
detain persons reasonably suspected of criminal activity on less information
than is constitutionally required for probable cause to arrest.[11]









The State bears the burden of
establishing the reasonableness of a warrantless detention.[12]  An investigative detention is reasonable only
if the officer has Aspecific
articulable facts,@ which,
premised upon the officer=s experience
and personal knowledge and coupled with the logical inferences from those
facts, warrant the intrusion on the detainee.[13]  The officer Amust be able to articulate something more than an inchoate and
unparticularized suspicion or hunch.@[14]  

Terry dictates a two-pronged analysis to determine reasonableness: first,
whether the officer=s action was
justified at its inception; and second, whether it was reasonably related in
scope to the circumstances that justified the interference in the first place.[15]  AReasonableness@ under
Fourth Amendment standards is a fact-specific inquiry Ameasured in >objective
terms by examining the totality of the circumstances.=@[16]  To determine Areasonableness,@ we  balance the legitimate public interest served
against the individual=s right to
be free of arbitrary detentions and intrusions.[17]









Appellant does not question
the validity of the initial stop. 
Therefore, we focus on Terry=s second prong.  Appellant challenges the extension of the
investigation regarding the stop to him as a mere passenger, contending that
questioning him as to his identity and checking for outstanding warrants
without separate reasonable suspicion as to him were beyond the scope of the
purpose of the stop and unreasonably prolonged its duration. 

The Ascope@ of an
investigative detention is limited by the second prong of Terry both as
to the duration of the detention and as to the manner in which the
investigation is carried out.  A[A]n investigative detention must be temporary and last no longer than
is necessary to effectuate the purpose of the stop [and] . . . the
investigat[ory] methods employed should be the least intrusive means reasonably
available to verify or dispel the officer=s suspicion. . . .@[18]  A detention that is not
temporary nor reasonably related in scope to the circumstances that justified
the stop is unreasonable and, thus, violative of the Fourth Amendment.[19]         








To be reasonably related in
scope, the investigation must be limited by the justification for the stop.[20]  An investigative detention must be Astrictly circumscribed by the exigencies which justify its initiation.@[21] A seizure reasonable at its inception may nevertheless violate the
Fourth Amendment by its excessive intensity and scope.[22]
 The nature of questioning during the
latter part of a detention may, itself, indicate that the justification for the
original detention no longer exists.[23]  And a seizure lawful at its inception may
nevertheless violate the Fourth Amendment by the Amanner of execution@ of the investigation.[24]
   








To determine whether the
duration of an investigative detention is reasonable, the relevant question is Awhether the police diligently pursued a means of investigation that
was likely to confirm or dispel their suspicions quickly. . . .@[25]  The Supreme Court has rejected
any rigid time limit on the duration of a valid Terry stop.[26]  To determine whether the duration is
reasonable, A[w]e look to
the scope of the stop. . . .@[27]  The permissible duration is
measured by the time reasonably necessary to complete a brief investigation of
the matters that justified the stop.[28]  Specifically, @[a] seizure that is justified solely by the interest in issuing a
warning ticket to the driver can become unlawful if it is prolonged beyond the
time reasonably required to complete that mission.@[29]













Once the original purpose for
the stop is concluded, the detention must end.[30]  A detention may not be unnecessarily
prolonged solely in hopes of finding evidence of some other crime.[31]  The stop may not be used as a Afishing expedition for unrelated criminal activity.@[32]  But if reasonable suspicion of
additional criminal activity arises in the course of a stop and before the
purpose of the stop is fulfilled, then a continued detention may be justified
until the new suspicion has been confirmed or dispelled.[33]
 Thus, an investigation pursuant to a
traffic stop Amay last as
long as is reasonably necessary to effectuate the purpose of the stop,
including the resolution of reasonable suspicion, supported by articulable
facts within the officer=s
professional judgment, that emerges during the stop.@[34]  








Appellant first contends
that, since the traffic stop was based only upon  violation of a traffic law by the driver, the
officers had no authority to request identification from him initially, as a
mere passenger, absent reasonable suspicion to extend the scope of the
investigation to him.  We disagree.       During a routine stop for a traffic
violation by the driver, officers may question the driver; request his license,
insurance papers, and information on ownership of the vehicle; and ask about
the driver=s
destination and the trip=s purpose.[35]  And the court of criminal appeals recently
noted that Athe
detaining officer may also question the vehicle=s occupants regarding their identities, travel plans, and ownership of
the vehicle.@[36]  But the court in that case was
addressing the scope of an investigative detention of a driver, not a passenger
as to whom the officer had no separate reasonable suspicion of criminal
activity.

The State relies on numerous
court of criminal appeals cases for the proposition that there is no
prohibition against requesting identification from passengers.[37]  But the State=s reliance on those cases also begs the question because, in each of
those cases, the officers had previously developed a separate reasonable
suspicion for investigatory detention of the passengers before questioning
them.  Questioning the passengers was
justified in each case based upon articulable facts creating reasonable
suspicion implicating all occupants in criminal activity.  








Indeed, the State
acknowledges that the court of criminal appeals did not specifically say in
those cases that an officer may identify a passenger, and it cites no case on
the question raised here: whether a passenger who is simply a passive occupant
may be questioned regarding his identity during a routine traffic stop absent
reasonable suspicion that he was implicated in the reason for the stop or that
other criminal activity was afoot.[38]       








To answer this question, we
start with the proposition that Apassengers in an automobile are subject to temporary investigative
detentions in the same manner as pedestrians.@[39]  A[L]aw enforcement officers do not violate the Fourth Amendment by
merely approaching an individual on the street or in another public place, by
asking him if he is willing to answer some questions, by putting some questions
to him if the person is willing to listen, or by offering in evidence
. . . his voluntary answers to such questions.@[40]  Mere questioning is neither a
search nor a seizure.[41]  A[D]etention, not questioning, is the evil at which Terry=s second prong is aimed.@[42]  As the Supreme Court stated, A[s]ince Terry, we have held repeatedly that mere police
questioning does not constitute a seizure.@[43]

Therefore, we hold
that merely asking for a passenger=s identity or identification during a routine traffic stop does not
require separate reasonable suspicion as to the passenger.[44]  








It does not follow, however,
that answers may be compelled. AThe person approached . . . need not answer any question put
to him; indeed, he may decline to listen to the questions at all and may go his
way.@[45]  The appropriate inquiry is not
whether the occupant of a vehicle is free to leave the scene but Awhether a reasonable person would feel free to decline the officer=s requests or otherwise terminate the encounter.@[46]








Thus, even when they have no
basis for reasonable suspicion, officers may ask questions of passengers and
request identification, Aas long as
the police do not convey a message that compliance with their requests is
required.@[47]  It is Asettled principle that while police have the right to request citizens
to answer voluntarily questions concerning unsolved crimes they have no right
to compel them to answer.@[48] 

        Appellant was asked within seconds of the
traffic stop whether he had identification with him and, according to the
officers, was asked to identify himself. 
He voluntarily provided a name to the deputies, albeit a false one.  Appellant does not suggest that the initial
request was coercive, nor does the videotape indicate that the deputies
conveyed an initial message that compliance was required.  Therefore, the mere questioning of Appellant
and his answer as to his identity in the course of the initial stop may be
termed a Aconsensual
encounter@ and did not
contravene the Fourth Amendment.

We now turn to the crux of
Appellant=s appeal,
that the continued questioning regarding his identity after the purpose of the
stop was complete was unrelated to the purpose of the traffic stop and
unreasonably prolonged its duration, thereby failing the Ascope@ requirement
of Terry.  The State concedes that
the officers continued to question Appellant about his identity after the
traffic stop for the nonfunctioning license plate lamp was complete.  








We note that, at the
suppression hearing, Deputy Young opined that Appellant was not Adetained,@ that he was
A[a]bsolutely [free to go.]@  But the conduct of the
officers and their responses to each of Appellant=s complaints about the continued questioning belie that conclusion by
Deputy Young.  It is clear from the
videotape that Appellant=s continuing
encounter with Deputies Young and Frisbee was in no sense Aconsensual.@  Even the State does not disagree that the
questioning escalated into an investigatory detention focused on Appellant to
demand his identity from the moment Deputy Young went back to Appellant=s side of the stopped vehicle to ask whether he had ever had a
license.  

For ten minutes after the
warning ticket was handed to the mother, the officers blocked Appellant=s door and stated at least four times that Athis has to be resolved,@ Awe [have to]
make sure, you know, you are who you say you are,@ Aas soon as
we get a return . . . we will be all done,@ and Awe just want
to find out your right name.@  The message that Appellant was
being detained until he identified himself was clearly conveyed.  The deputies were not simply inquiring, they
were demanding Appellant=s identity
with the promise of continued detention until they got it.  This they could not do, absent reasonable
suspicion.  








This issue was decided
against the State in Brown v. Texas, in which the Supreme Court ruled
that Texas Penal Code section 38.02(a), as enacted by the
Texas legislature in 1974, was unconstitutional precisely
because it allowed an officer to stop and demand
identification of an individual without any specific basis or belief that he
was involved in criminal activity.[49]
The Court reasoned that, in the absence of any basis for suspecting Brown of
misconduct, the balance between the public interest and Brown=s right to personal security and privacy tilts in favor of freedom
from police interference.[50]








The Texas
statute under which Brown was stopped and required to identify himself was, the
Supreme Court recognized, designed to advance a weighty social objective: prevention of crime in large metropolitan areas.  But assuming that this purpose is served to
some degree by stopping and demanding identification from an individual without
a specific basis to believe he is involved in criminal activity, the guarantees
of the Fourth Amendment do not allow it. 
When such a demand is not based on objective criteria, the risk of
arbitrary and abusive police practices exceeds tolerable limits.[51]  








The deputies= continued detention to investigate AppellantCafter the purpose of the traffic stop was completeCsolely to demand that he identify himself was illegal under the Fourth
Amendment unless Appellant was then Alawfully detained@ based upon articulable facts establishing reasonable suspicion
developed during the course of the initial stop.[52]

The State does not
disagree.  Rather, it contends that,
during the course of the initial stop, the officers did develop separate
reasonable suspicion that Appellant was engaged in or soon would engage in
criminal activity, justifying his continued detention and questioning after the
purpose of the initial stop was complete.








The State first points to the
deputies= observation of Appellant=s Anervousness.@  However, it is well settled
that nervousness alone is not enough to amount to reasonable suspicion.[53]  The State acknowledges that nervousness
cannot be the only factor.  Thus, the
State further argues that Appellant=s continued detention was also justified because he was committing the
offense of Afailure to
identify@ when he gave a false name during the first few seconds of the stop.[54]  While the trial court agreed during the
suppression hearing that, absent reasonable suspicion, the officers could not
properly have continued to detain and question Appellant regarding identity, he
also agreed with the State=s argument that the initial misidentification constituted an objective
basis to continue the investigation under the totality of the
circumstances.  








But the timing of the
misidentification is significant.  The
officers did not know the name was a misidentification, either when Appellant
volunteered it or when they returned to continue questioning him after issuing
the warning ticket.  The giving of the
false nameCwhen the
officers did not know it was falseCcould not have furnished reasonable suspicion to entitle them to
investigate further.[55]

While it is true that the
dispatcher reported Ano record@ on the license and warrants check for the name first provided by
Appellant, no evidence indicates how or why the absence of a record, even with
nervousness, provided  reasonable
suspicion that an offense was being or would be committed.  When asked at the suppression hearing about
the meaning of the absence of a record of any license for Appellant, Deputy
Young testified only, AWhatever
that means, there=s no record.@[56]  Moreover, the State does not
contend, nor did Deputy Young testify, that Ano record@ raised a
suspicion of any mis-identification or other wrongdoing, and we would only be
speculating to so infer. 








The other facts upon which
the State relies for reasonable suspicion were, first, the conflicting names
given by Appellant and, second, the discovery of the outstanding warrants for
Appellant=s
arrest.  But the conflicting names did
not emerge until over ten minutes into the stop, after issuance of the warning
ticket, after further questioning, and after the dispatcher reported the
discovery of a AJohn
Christopher St. George.@  By that time, the purpose of the stop was
resolved and the driver and Appellant should already have been released.  And the outstanding warrants discovered at
the end of the investigative detention were the consequence of the
investigative detention, not the basis for it. 
Neither the conflicting names nor the outstanding warrants could  somehow relate back to provide articulable
facts for the officers to justify detaining Appellant when those facts arose as
a result of the original detention.  We
cannot retroactively justify the continued detention on this post hoc basis.













Finally, the State contends
that a warrant check on a passenger is proper as a routine and necessary part
of a traffic stop, and the Appellant=s continued detention was thus reasonable as within the scope of the
original purpose of the stop.  We
disagree.[57]  The State has not cited, nor have we found, a
case holding that warrant checks on passengers, as compared with such checks on
drivers, are a routine component of traffic stops.[58]  Moreover, the State here concedes that the
purpose of the stop for a non-functioning license plate light was complete
before the officers continued their questioning of Appellant to demand his
identity.  But as we have previously
noted, a warrant check cannot be used solely as a means to prolong a detention,
Aonce the reasonable suspicion forming the basis for the stop has been
dispelled.@[59]

Alternatively, the State
argues that the officers= purpose for
stopping the vehicle in this particular case included a warrant check on
Appellant.  While we might speculate that
the officers had some unarticulated knowledge that he might have outstanding
warrants, nothing in the record supports articulable facts establishing
reasonable suspicion that he was a fugitive.[60]       








The State never established
articulable facts arising during the initial traffic stop to support a
reasonable suspicion to justify the deputies= continued detention and investigation of Appellant for nearly ten
additional minutesCdouble the
time of the initial traffic stop. 
Considering the totality of the circumstances from an objective
standpoint, Appellant=s continued
detention was a classic Afishing
expedition,@ based on a
hunch.  Accordingly, we hold that the
prolonged duration of the detention of Appellant was illegal in violation of
the Fourth Amendment.

Appellant contends that his
false statements as to his identity and the marijuana discovered in the search
incident to his arrest on the outstanding warrants were obtained as the result
of the illegal detention and demands for his identification.  Thus, he argues that the evidence should be
suppressed as obtained in violation of the Fourth Amendment under the Afruits of the poisonous tree@ doctrine.[61]  In determining whether evidence was the fruit
of Appellant=s illegal
detention and questioning, the critical issue is whether the evidence was
gained by the exploitation of that illegality.[62]








Appellant=s first false identification was not made while he was Alawfully detained@ in violation of the failure to identify statute, since the deputies= initial request for his identity at the outset of the traffic stop
constituted only a consensual encounter, not an investigative detention.[63]  

But Appellant=s false statements as to his identity made as the result of police
questioning at the later time when he was illegally detained are clearly
causally connected to and the result of the illegal investigative detention
following the termination of the reason for the traffic stop.  This evidence was directly obtained in
violation of the Fourth Amendment. 
Accordingly, those false statements made by Appellant should have been
suppressed.[64]  Therefore, the trial court erred in denying
Appellant=s motion to
suppress the evidence of those false statements.








The contraband discovered in
Appellant=s possession
was obtained in the search incident to his arrest on the outstanding warrants
discovered by the deputies only after obtaining his correct name and birth date
through their continued questioning during the prolonged detention.  Generally, evidence obtained as a direct
result of illegal police conduct, be it illegal arrest or illegal search, is
suppressed either by cases providing the remedy of exclusion of such evidence
for violations of the Fourth Amendment and/or Article 1, section 9 of the Texas
Constitution, or by statutory provisions such as code of criminal procedure
article 38.23.[65]








The primary purpose of the
exclusionary rule and of article 38.23 is to deter unlawful police conduct by
precluding the use against the accused of evidence obtained by illegal police
activity.[66]  The federal
exclusionary rule and article 38.23 extend not only to evidence obtained as a
direct result of an illegal arrest, search, or seizure, but also to evidence
obtained as an indirect result of an illegal arrest, search, or seizure, known
as the Afruit of the
poisonous tree.@[67]








        On
the other hand, both the federal and state exclusionary rules allow the
admission of otherwise tainted evidence if the connection between the initial illegality and the discovery of the challenged evidence has
become so attenuated as to dissipate the taint of the prior illegality.[68]  But the prosecution bears the burden of showing that unlawfully obtained evidence is admissible
under an exception to the federal exclusionary rule.[69]
The prosecution also has the burden under article 38.23
to show the applicability of the attenuation doctrine to
the challenged evidence.[70]  The State has not contended that the
attenuation doctrine should apply in this case, and we do not address it
further.  Additionally, courts have
cautioned against allowing evidence to be admitted that has been obtained in a
manner that would undermine the policies of deterrence and integrity of the
courts.[71]  We are admonished by the Supreme Court in Terry
that we, as the judiciary, are responsible to Aguard against police conduct which is over-bearing or harassing, or
which trenches upon personal security without the objective evidentiary
justification which the Constitution requires.@[72]  We sustain Appellant=s two points.

Conclusion








We hold that
the trial court erred by denying Appellant=s motions to suppress his statements and the marijuana.  Therefore, we reverse Appellant=s conviction for the offense of possession of marijuana as well as the
conviction for failure to identify and remand those causes to the trial court
for proceedings not inconsistent with this opinion.

 

 

ANNE GARDNER

JUSTICE

 

EN BANC[73]

 

CAYCE, C.J.; HOLMAN and MCCOY, JJ. 
dissent without opinion.

 

PUBLISH

 

DELIVERED:  May 25, 2006

 











[1]Ford
v. State, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005);
Carmouche v. State, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000).  





[2]Romero
v. State, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); Best
v. State, 118 S.W.3d 857, 861 (Tex. App.CFort Worth 2003, no
pet.).  





[3]State
v. Ross, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000); State v. Ballard,
987 S.W.2d 889, 891 (Tex. Crim. App. 1999). 






[4]Carmouche, 10
S.W.3d at 327; Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App.
1997). 





[5]Ford, 158
S.W.3d at 493; Carmouche, 10 S.W.3d at 327-28. 





[6]Kothe
v. State, 152 S.W.3d 54, 61 (Tex. Crim. App. 2004);
Carmouche, 10 S.W.3d at 327-28; Guzman, 955 S.W.2d at 87. 





[7]Terry
v. Ohio, 392 U.S. 1, 9, 88 S. Ct. 1868, 1873 (1968)
(citing Elkins v. United States, 364 U.S. 206, 222, 80 S. Ct. 1437, 1446
(1960)).





[8]Id. at
8-9.





[9]See Kothe,
152 S.W.3d at 61 & n.19 (discussing standing of passenger to challenge
constitutionality of detention); United States v. Brigham, 382 F.3d 500,
506 (5th Cir. 2004).  The Supreme Court
has not specifically held that a passenger, as distinguished from the driver,
is seized at the moment of the stop but has recognized that, as a practical
matter, any passengers are stopped by virtue of the stop of the vehicle.  Maryland v. Wilson, 519 U.S. 408,
412-14, 117 S. Ct. 882, 885-86 (1997). 





[10]Berkemer
v. McCarty, 468 U.S. 420, 436, 439, 104 S. Ct. 3138, 3148,
3150 (1984) (noting traffic stop Asignificantly curtails the >freedom
of action= of
the driver and the passengers@ alike); United States v.
Valadez, 267 F.3d 395, 397-98 (5th Cir. 2001).  





[11]Terry, 392
U.S. at 21-22, 88 S. Ct. at 1880. 





[12]Ford, 158
S.W.3d at 492. 





[13] Id.
at 492, 493-94.





[14]United
States v. Sokolow, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585 (1989). 





[15]Terry, 392
U.S. at 19-20, 88 S. Ct. at 1879; Davis v. State, 947 S.W.2d 240, 242
(Tex. Crim. App. 1997). 





[16]Kothe, 152
S.W.3d at 63 (quoting Ohio v. Robinette, 519 U.S. 33, 39, 117 S. Ct.
417, 419 (1996)).  





[17]Id.
(citing Pennsylvania v. Mimms, 434 U.S. 106, 109, 98 S. Ct. 330, 332
(1977) (per curiam)).  





[18]Florida
v. Royer, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325-26
(1983); see also United States v. Hensley, 469 U.S. 221, 235, 105 S. Ct.
675, 683 (1985) (examining under Terry both Athe
length and intrusiveness of the stop and detention@). 





[19]Davis, 947
S.W.2d at 242-43. 





[20]Terry, 392
U.S. at 29, 88 S. Ct. at 1884.





[21]Id. at
25-26, 88 S. Ct. at 1882; see also Knowles v. Iowa, 525 U.S. 113, 118,
119 S. Ct. 484, 488 (1998) (invalidating statute authorizing full search of
automobile incident to citation for speeding since A[n]o
further evidence of excessive speed[ing] was going to be found@ once
vehicle was stopped and citation issued). 






[22]Davis, 947
S.W.2d at 243. 





[23]United
States v. Shabazz, 993 F.2d 431, 436 (5th Cir. 1993). 





[24]Illinois
v. Caballes, 543 U.S. 405, 407, 125 S. Ct. 834, 837 (2005). 





[25]United
States v. Sharpe, 470 U.S. 675, 685-86, 105 S. Ct. 1568, 1575
(1985).  





[26]Kothe, 152
S.W.3d at 64 (citing Sharpe, 470 U.S. at 685-86, 105 S. Ct. at 1575
(rejecting a per se rule that a twenty-minute detention was too long under the
circumstances)). 





[27]United
States v. Machuca-Barrera, 261 F.3d 425, 432 (5th Cir. 2001).





[28]Id.;
see United States v. Sandoval, 29 F.3d 537, 542-43 (10th
Cir. 1994) (holding that prolonged detention beyond time necessary to write
citation was unreasonable absent reasonable suspicion of criminal activity);
People v. Cox, 782 N.E.2d 275, 280-81 (Ill. 2002) (detention for fifteen
minutes to write out ticket while awaiting arrival of drug-sniffing dog called
at outset of stop held unreasonable absent reasonable suspicion); Haas v.
State, 172 S.W.3d 42, 50 (Tex. App.CWaco 2005, pet. ref=d)
(citing United States v. Kelley, 981 F.2d 1464, 1470 (5th Cir. 1993))
(noting, under appropriate circumstances, extensive questioning about matters wholly
unrelated to routine traffic stop may violate Fourth Amendment).





[29]Caballes, 543
U.S. at 407, 125 S. Ct. at 837. 





[30]Kothe,
152 S.W.3d at 64; Davis, 947 S.W.2d at 245 (purpose of stop for
suspicion of DWI effectuated and detention should have ended when officer
determined driver was merely tired).





[31]See
Kothe, 152 S.W.3d at 64; Valadez, 267 F.3d at 398 (continued
questioning on unrelated matter and computer check on warrants and criminal
history impermissible where officer=s suspicions on which stop
was based had already been dispelled); Machuca-Barrera, 261 F.3d at 432
(once reason for stop has been satisfied, detained individual must be free to
leave). 





[32]Davis, 947
S.W.2d at 243 (quoting Robinette, 519 U.S. at 41, 117 S. Ct. at
422 (Ginsberg, J., concurring)). 





[33]See
id. at 244; Perales v. State, 117 S.W.3d 434, 439 (Tex. App.CCorpus
Christi 2003, pet. ref=d); see
also United States v. Jones, 234 F.3d 234, 241 (5th Cir. 2000); United
States v. Dortch, 199 F.3d 193, 200 (5th Cir. 1999).  





[34]Brigham, 382
F.3d at 512. 





[35]Kothe,
152 S.W.3d at 63; Davis, 947 S.W.2d at 245 n.6; Freeman v.
State, 62 S.W.3d 883, 888 (Tex. App.CTexarkana 2001, pet. ref=d); see
also Smith v. State, 840 S.W.2d 689, 692 (Tex. App.CFort
Worth 1992, pet. ref=d); Petty
v. State, 696 S.W.2d 635, 638-39 (Tex. App.CDallas
1985, no pet.); 4 Wayne R.
LaFave, Search & Seizure ' 9.3(c), at 378-79, 381, 383
(4th ed. 2004) (noting routine computer check on driver serves objectives
related to reason for stop in ensuring that only those qualified to do so are
permitted to operate vehicles on public roads).     





[36]Kothe,
152 S.W.3d at 64 n.36 (citing United States v. Zabalza, 346
F.3d 1255, 1259 (10th Cir. 2003)); cf. Freeman, 62 S.W.3d at 888
(holding officer=s
request to see both driver=s and passenger=s
licenses and questioning of both as to destination and purpose of trip not
unreasonable).





[37]See,
e.g., Duff v. State, 546 S.W.2d 283, 286-87 (Tex. Crim. App. 1977)
(passenger reeked of marijuana smoke and gave conflicting story to that of
driver before being asked for identification); Tardiff v. State, 548
S.W.2d 380, 381-82 (Tex. Crim. App. 1977) (question by one passenger about
person wanted by police, weaving back and forth, and smell of marijuana on both
passengers); Borner v. State, 521 S.W.2d 852, 854-55 (Tex. Crim. App.
1975) (passenger observed attempting to stuff something between seats); Wood
v. State, 515 S.W.2d 300, 305 (Tex. Crim. App. 1974) (passenger appeared
intoxicated); Leonard v. State, 496 S.W.2d 576, 577 (Tex. Crim. App.
1973) (officer smelled odor of marijuana coming from vehicle as he bent down to
look at passenger); see also Rhodes v. State, 945 S.W.2d 115, 116-17
(Tex. Crim. App.), cert. denied, 522 U.S. 894 (1997) (during a chase,
officers saw passenger open vehicle door and drop a Crown Royal bag, typically
used to contain illegal drugs, out of vehicle). 






[38]The
Supreme Court recently reaffirmed that, where reasonable suspicion does
exist, A[o]ur
decisions make clear that questions concerning a suspect=s
identity are a routine and accepted part of many Terry stops.@  Hiibel v. Sixth Judicial Dist. Court of
Nev., Humboldt County, 542 U.S. 177, 186-88, 124 S. Ct. 2451, 2458-59
(2004) (citing United States v. Hensley, 469 U.S. 221, 229, 105 S. Ct.
675, 680 (1985)).  A[I]f
there are articulable facts supporting a reasonable suspicion that a person has
committed a criminal offense, that person may be stopped in order to identify
him, to question him briefly, or to detain him briefly while attempting to
obtain additional information.@  Id. (quoting Hayes v. Florida, 470
U.S. 811, 816, 105 S. Ct. 1643, 1647 (1985)). 





[39]Rhodes,
945 S.W.2d at 117 (citing Adams v. Williams, 407 U.S. 143, 92
S. Ct. 1921 (1972) (extending Terry, which involved stop of citizens on
street, to occupant of vehicle)). 





[40]Gearing
v. State, 685 S.W.2d 326, 328 (Tex. Crim. App. 1985)
(quoting Royer, 460 U.S. at 497, 103 S. Ct. at 1324), overruled on
other grounds by Woods v. State, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997).





[41]Shabazz, 993
F.2d at 436. 





[42]Id.





[43]Florida
v. Bostick, 501 U.S. 429, 434, 111 S. Ct. 2382, 2386 (1991).





[44]Accord
State v. Hernandez, 64 S.W.3d 548, 552 (Tex. App.CTexarkana
2001, no pet.) (holding that questioning of passengers on bus, including asking
for driver=s
licenses and tickets, constituted consensual encounter and passengers were free
to decline to answer questions); see also People v. Jackson, 39 P.3d
1174, 1178 (Colo. 2002) (holding officer=s request for passenger=s
identification during stop constituted lawful consensual encounter); People
v. Gonzalez, 789 N.E.2d 260, 270 (Ill. 2003) (holding officer=s
request for passenger=s
identification not unreasonable although unrelated to reason for stop, where it
did not prolong detention and passenger was under no obligation to answer); State
v. Riley, 501 N.W.2d 487, 489 (Iowa 1993) (holding asking passenger for
identification not improper).





[45]Gearing, 685
S.W.2d at 329 (citing Terry, 392 U.S. at 32-33, 88 S. Ct. at 1885-86)
(Harlan, J., concurring)); see also United States v. Drayton, 536 U.S.
194, 201, 122 S. Ct. 2105, 2110 (2002) (holding reasonable suspicion not
required provided police do not induce cooperation by coercive means).





[46]Bostick,
501 U.S. at 436, 111 S. Ct. at 2387 (holding that if random,
suspicionless questioning of bus passengers for inspection of identification
and tickets was Aconsensual
encounter,@ it
was not a violation of passengers= Fourth Amendment rights).






[47]Id. at
435, 111 S. Ct. at 2386; see State v. Velasquez, 994 S.W.2d 676, 678
(Tex. Crim. App. 1999). 





[48]Kolender
v. Lawson, 461 U.S. 352, 360 n.9, 103 S. Ct. 1855, 1859 n.9
(1983) (quoting Davis v. Mississippi, 394 U.S. 721, 727 n.6, 89 S. Ct.
1394, 1397 n.6 (1969)).  





[49]443
U.S. 47, 52-53, 99 S. Ct. 2637, 2641 (1979); see also Hull v. State, 613
S.W.2d 735, 740 (Tex. Crim. App. 1981) (holding arrest of individual for
refusal to identify violated Fourth Amendment absent particularized and
objective suspicion of criminal activity on his part).





[50]Brown, 443
U.S. at 52, 99 S. Ct. at 2641.





[51]Id. at
52, 99 S Ct. at 2641; see also Hiibel, 542 U.S. at 184, 187-88, 124 S.
Ct. at 2457, 2459 (distinguishing Texas statute invalidated in Brown,
upholding Nevada statute requiring individual to provide name in the course of
a valid Terry stop based upon specific objective facts establishing
reasonable suspicion).  After the Court=s
ruling, section 38.02(a)-(b) was amended, effective September 1987, to read as
follows: 

 

(a) A
person commits [the] offense [of failure to identify] if he intentionally
refuses to report or give his name, residence address, or date of birth to a peace
officer who has lawfully arrested the person and requested the information. (b)
A person commits an offense if he reports or gives a false or fictitious name,
residence address, or date of birth to a peace officer who has lawfully
arrested the person or who has requested the information from a person that the
peace officer has good cause to believe is a witness to a criminal offense.

 

Act
of May 29, 1987, 70th Leg., R.S., ch. 869, 1987 Tex. Gen. Laws 2944 (amended
1993) (current version at Tex. Penal Code
Ann. '
38.02 (Vernon Supp. 2005)).





[52]See
Sims v. State, 84 S.W.3d 805, 809-10 (Tex. App.CHouston
[1st Dist.] 2002, no pet.) (defendant not Alawfully detained@
within meaning of statute where officer lacked specific articulable facts at
time defendant misidentified himself to create reasonable suspicion connecting
him with criminal activity). 





[53]See,
e.g., Holladay v. State, 805 S.W.2d 464, 472-73 (Tex. Crim. App.
1991), overruled on other grounds by Hunter v. State, 955 S.W.2d 102
(Tex. Crim. App. 1997); Glass v. State, 681 S.W.2d 599, 602 (Tex. Crim.
App. 1984); LeBlanc v. State, 138 S.W.3d 603, 608 n.6 (Tex. App.CHouston
[14th  Dist.] 2004, no pet.).

 





[54]Under
section 38.02 of the Penal Code, A[a] person commits an offense
if he intentionally gives a false or fictitious name, residence address, or
date of birth to a peace officer who has . . . lawfully detained the
person.@  Tex.
Penal Code Ann. '
38.02(b)(2).  The offense is elevated
from a class B to a class A misdemeanor if the person was a fugitive at the
time of the offense.  Id. '
38.02(d).   





[55]See
Sims, 84 S.W.3d at 809-10 (when deputy initiated investigative detention, he
did not know appellant had given him incorrect spelling of his name; thus,
officer=s
further detention could not be based on reasonable suspicion of violation of
failure-to-identify statute); cf. Farmer v. State, 47 S.W.3d 187, 190-91
(Tex. App.CTexarkana
2001, pet. ref=d)
(holding whether passenger was Alawfully detained@ as
witness to traffic violation when officer asked his name so that his false
identification violated failure-to-identify statute not necessary to decide
since other articulable facts justified continued detention).





[56]See
People v. Miles, 798 N.E.2d 1279, 1285 (Ill. App. Ct. 2003)
(refusing to fill gap in evidence by taking judicial notice of meaning of
absence of record of license when officers provided no explanation as to why
result of license check of Ano record on file@ was
inherently suspicious).    





[57]See
Delaware v. Prouse, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401 (1979)
(holding random traffic stops for license and registration checks are contrary
to Fourth Amendment).  





[58]See
Kothe, 152 S.W.3d at 64 (noting that license and warrant check on driver is
generally viewed as reasonable law enforcement exercise and an Aadditional
component@ of a
routine traffic stop).  But see State
v. Page, 103 P.3d 454, 460 (Idaho 2004) (holding encounter became improper
detention when officer took passenger=s license back to police car to
run warrant check); see generally 4 LaFave,
supra note 35,'
9.3(d), at 388-89 & n.158 (stating, Ait is to be doubted whether
there is any valid reason for automatic warrant checks on mere passengers@).     





[59]Kothe, 152
S.W.3d at 64; see Tucker v. State, 183 S.W.3d 501, 509 (Tex. App.CFort
Worth 2005, no pet.) (holding officers had reasonable suspicion to identify
passengers and check for outstanding warrants after traffic stop when the
officers previously had been notified that car contained named felony parole
violator); Petty v. State, 696 S.W.2d 635, 638 (Tex. App.CDallas
1985, no pet.) (holding warrant check not unreasonable where detention not
extended solely for that purpose); see also People v. McGaughran,
601 P.2d 207, 212 (Cal. 1979) (noting warrant check permissible if stop not
extended solely for that purpose); Jackson, 39 P.3d at 1190 (holding
detention of passenger for warrant check violated Fourth Amendment absent
reasonable suspicion).  





[60]But
see Tucker, 183 S.W.3d at 509 (holding officers=
information that described vehicle, including license number, contained parole
violator constituted reasonable suspicion to check for warrants).





[61]See
Wong Sun v. United States, 371 U.S. 471, 484-85, 83 S. Ct. 407,
415-16 (1963); see also Tex. Code
Crim. Proc. Ann. art. 38.23(a) (Vernon 2005).





[62]Neese
v. State, 930 S.W.2d 792, 801 (Tex. App.CBeaumont
1996, pet. ref=d)
(citing Wong Sun, 371 U.S. at 488, 83 S. Ct. at 417).





[63]See
Quick v. State, 999 S.W.2d 79, 80-81 (Tex. App.CHouston
[14th Dist.] 1999, no pet.) (holding that because appellant was not under
arrest or detained at time he gave officer a false name, the evidence was
legally insufficient to support his conviction for failure to identify).  





[64]See
Domingo v. State, 82 S.W.3d 617, 622 (Tex. App.CAmarillo
2002, no pet.) (holding that appellant was not lawfully detained for
investigation of public intoxication when he gave false identification;
therefore, trial court erred in denying his motion to suppress his false
identification statements). 





[65]See
Boyd v. United States, 116 U.S. 616, 638, 6 S. Ct. 524, 538
(1886); Bell v. State, 724 S.W.2d 780, 787 (Tex. Crim. App. 1986), cert.  denied, 479 U.S. 1046 (1987); see also
United States v. Calandra, 414 U.S. 338, 347-48, 94 S. Ct. 613, 619-20
(1974).





[66]Article
38.23(a) provides, 

 

No evidence obtained
by an officer or other person in violation of any provisions of the
Constitution or laws of the State of Texas, or of the Constitution or laws of
the United States of America, shall be admitted in evidence against the accused
on the trial of any criminal case.

 

Tex. Code Crim. Proc. Ann. art.
38.23(a); Calandra, 414 U.S. at 347, 94 S. Ct. at 619-20. 





[67]See
Wong Sun, 371 U.S. at 484, 83 S. Ct. at 416; Smith v.
State, 542 S.W.2d 420, 422 (Tex. Crim. App. 1976); State v. Mayorga,
876 S.W.2d 176, 177 (Tex. App.CDallas 1994), aff=d and
remanded, 901 S.W.2d 943 (Tex. Crim. App. 1995).





[68]See
Wong Sun, 371 U.S. at 487, 83 S. Ct. at 417; Johnson v.
State, 871 S.W.2d 744, 750 (Tex. Crim. App. 1994) (holding attenuation analysis applicable under article 38.23 as a method of
determining whether evidence was Aobtained@ in
violation of law).





[69]See
Brown v. Illinois, 422 U.S. 590, 604-05, 95 S. Ct. 2254, 2262
(1975); see also Nix v. Williams, 467 U.S. 431, 444, 104 S. Ct. 2501,
2509 (1984) (burden of proof on prosecution to show
exception to exclusionary rule by preponderance of evidence).





[70]See
Brown, 422 U.S. at 603-04, 95 S. Ct. at 2261-62; Gordon v. State, 801 S.W.2d 899, 913 n.14 (Tex. Crim. App. 1990).





[71]As to
application of the attenuation doctrine where evidence was obtained by search incident
to a legal arrest pursuant to outstanding warrants discovered during an illegal
detention, see Fletcher v. State, 90 S.W.3d 419, 421 (Tex. App.CAmarillo
2002, no pet.) (A[O]ur
decision should not be read as implying that an officer may detain individuals
for no other reason than his hope to later discover that they are subject to
arrest via a pre-existing, valid warrant.@).  See also McBath v. State, 108 P.3d
241, 249 (Alaska Ct. App. 2005) (noting even where evidence clearly obtained
via valid outstanding warrant, flagrance of police misconduct may still require
exclusion Aas,
for example, where the police conducted an unjustifiable >dragnet=
investigative stop of many people, hoping to find some for whom there were
outstanding arrest warrants@); State v. Bigham,
117 P.3d 146, 149 (Idaho Ct. App. 2005) (holding taint from illegal detention
attenuated by discovery of outstanding warrant where there was no evidence
officer stopped appellant solely to request identity in order to run warrant
check).  





[72]Terry, 392
U.S. at 15, 88 S. Ct. at 1876.





[73]Tex. R. App. P. 42.1.